UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JANORA R. WINSOR, | Case No. 2:14-cv-00347-GMN-PAL |
| Plaintiff, | |
| v. | **REPORT OF FINDINGD AND RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | (Mot. To Remand – ECF No. 18) (Cross-Mot. to Affirm – ECF No. 21) |
| Defendant. | |

This matter involves Plaintiff Janora R. Winsor's appeal and request for judicial review of the Commissioner of Social Security, Defendant Carolyn W. Colvin's final decision denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33 and claim for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

## BACKGROUND

**I.   PROCEDURAL HISTORY**

Plaintiff Janora R. Winsor ("Winsor") filed for social security disability benefits and supplemental social security income on May 28 and 29, 2010, alleging onset of disability on April 18, 2007, the day she last worked.  AR 137-140, 155-162.  At the time of her application she was 43 years old.  AR 137.  She alleged she stopped working as a result of disability based on a right knee impairment, deep vein thrombosis, hip pain, soft tissue injuries of the knees requiring multiple procedures, and factor V Leiden.  AR 156.  Her work history report (AR 162-172) indicated she was previously employed as a paralegal with law firms from February 2004, through April 18, 2007, as a receptionist from April 2003, through October 2004, a retail store manager from January 1983 to January 2004 (AR 157), and a court secretary from December

1

2001 through March 2003.  AR 162.  At the time of her application, she was treating with Dr. Maria Adolfo, and was prescribed Clonazepam and Zolpidem Tartrate for sleep, Hydrocodone, Meloxicam and Tylenol for pain, and Warfarin as a blood thinner.  AR 159.  During the hearing, Winsor's non-attorney representative asserted his theory of the case was that Winsor met Listing 1.02A, based on a major dysfunction of the lower extremity, both knees, because she was unable to ambulate effectively.  AR 42.

The Social Security Administration ("SSA") denied Winsor's application initially and on reconsideration.  AR 82-86, 88-90.  She requested a hearing before the Administrative Law Judge ("ALJ") which was held January 10, 2012, in Las Vegas, Nevada before ALJ Craig Ellis. Winsor appeared at the administrative hearing and she was represented by a non-attorney representative.

In a decision dated June 18, 2012, the ALJ found that Winsor was not disabled.  AR 26-34.  The ALJ found Winsor suffered from severe degenerative joint disease of both knees, chronic low back pain, a history of lupus, and obesity.  However, he found that she had the capacity to perform a full range of sedentary work and could therefore perform her past relevant work as a legal secretary and receptionist.  AR 26-34.

Winsor requested review of the ALJ's decision by the Appeals Council.  The Appeals Council considered additional medical evidence and legal arguments Winsor submitted in support of her claim, but denied review on January 9, 2014, upholding the ALJ's decision, making the ALJ's decision the final decision of the commissioner.  AR 1-7.

On March 6, 2014, Winsor filed Complaint (ECF No. 1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (ECF No. 14) on July 29, 2014.  Winsor filed a Motion to Remand (ECF No. 18), and the Commissioner filed a Response and Cross-Motion to Affirm (ECF Nos. 21, 22).  The Court has considered the Motion, the Response and Cross-Motion, and Winsor's Reply and Opposition to Cross-Motion (ECF Nos. 23, 24).

/ / /

/ / /

# DISCUSSION

## I.   APPLICABLE LAW

### A.   Judicial Review of Disability Determination

District courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g). *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002). The statute provides that after the Commissioner has held a hearing and rendered a final decision, a disability claimant may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial district where the disability claimant lives. 42 U.S.C. § 405(g). The statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005). But the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). In determining whether the Commissioner's findings are supported by substantial evidence, a court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

Under the substantial evidence test, a court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003). When the evidence will support more than one rational interpretation, a court must defer to the Commissioner's interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Consequently, the issue before a court is not

1    whether the Commissioner could reasonably have reached a different conclusion, but whether

2    the final decision is supported by substantial evidence.

3         It is incumbent upon an ALJ to make specific findings so that a court does not speculate

4    as to the basis of the findings when determining if the Commissioner's decision is supported by

5    substantial evidence.  *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014).  Mere cursory

6    findings of fact without explicit statements about what portions of the evidence were accepted or

7    rejected are not sufficient.  *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).  An ALJ's

8    findings should be comprehensive, analytical, and include a statement explaining the "factual

9    foundations on which the ultimate factual conclusions are based."  *Id. See also Vincent v.*

10   *Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in

11   the record, but must explain why significant probative evidence has been rejected).

12               **B.     Disability Evaluation Process**

13        A claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179,

14   182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in

15   any substantial gainful activity by reason of any medically determinable physical or mental

16   impairment which can be expected . . . to last for a continuous period of not less than 12

17   months."  42 U.S.C. § 423(d)(1)(A).  A claimant must provide specific medical evidence to

18   support his or her claim of disability.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).  If a

19   claimant establishes an inability to perform his or her prior work, the burden shifts to the

20   Commissioner to show that the claimant can perform other substantial gainful work that exists in

21   the national economy.  *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a

22   claimant bears the burden of proof until the final step in the evaluation process).

23   **II.    THE ALJ'S DECISION**

24        An ALJ follows a five-step sequential evaluation process in determining whether a

25   claimant is disabled.  20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  If at

26   any step an ALJ makes a finding of disability or non-disability, no further evaluation is required.

27   20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

28

                                                   4

1    Here, the ALJ followed the five-step sequential evaluation process and issued an

2    unfavorable decision on June 18, 2013 (the "Decision").  AR 26-34.  He concluded that Winsor

3    had not been under a disability within the meaning of the Social Security Act from April 18,

4    2007, through the date of his decision.

5    Winsor does not challenge the ALJ's findings at steps one through three, but asserts legal

6    error at step four.

7    **A.    Step One**

8    The first step of the disability evaluation requires an ALJ to determine whether the

9    claimant is currently engaging in substantial gainful activity ("SGA").    20 C.F.R.

10   §§ 404.1520(b), 416.920(b).  SGA is defined as work activity that is both substantial and gainful;

11   it involves doing significant physical or mental activities, usually for pay or profit.  20 C.F.R.

12   §§ 404.1572(a)–(b), 416.972(a)–(b).  If the claimant is currently engaging in SGA, then a finding

13   of not disabled is made.  If the claimant is not engaging in SGA, then the analysis proceeds to the

14   second step.  At step one in the Decision, the ALJ found that Winsor had not engaged in SGA

15   since April 18, 2007, the alleged onset date.  AR 28.

16   **B.    Step Two**

17   The second step of the disability evaluation addresses whether a claimant has a

18   medically-determinable impairment that is severe or a combination of impairments that

19   significantly limits him or her from performing basic work activities.  20 C.F.R. §§ 404.1520(c),

20   416.920(c).  An impairment or combination of impairments is not severe when medical and other

21   evidence establish only a slight abnormality or a combination of slight abnormalities that would

22   have no more than a minimal effect on the claimant's ability to work.  20 C.F.R. §§ 404.1521,

23   416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, 96-4p.[1]  If a claimant does not have a

24   severe medically-determinable impairment or combination of impairments, then an ALJ will

25

26

27   [1] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray*, 554 F. 3d at 1223 (finding ALJ erred in disregarding SSR 85-41).

28

5

make a finding that a claimant is not disabled.  If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

### 1.    Winsor's Severe Impairments

At step two in the Decision, the ALJ found that Winsor had the following severe impairments: degenerative joint disease of the bilateral knees, chronic low back pain, history of lupus, and obesity.  AR 28.  He found these severe impairments had caused more than minimal work-related functional limitations which were discussed in more detail at Step Four.  *Id.*

### 2.    Winsor's Non-Severe Impairments

In making his findings at step two in the Decision, the ALJ specifically considered all of Winsor's medically determinable impairments, including two non-severe mental impairment(s).  AR 28-29.  He found that Winsor had a history of asthma which caused only a slight abnormality and would have no more than minimal effect on her ability to work.  *Id.*  The ALJ also considered Winsor's allegation of fibromyalgia diagnosed by Dr. Nicole Theuvenet.  However, he found the objective medical evidence did not rule out other diagnosed severe impairments as being responsible for the symptomatology.  *Id.*  He therefore found there was no medical and other evidence that fibromyalgia caused more than a minimal effect on her ability to work.  *Id.*

### C.    Step Three

Step three of the disability evaluation requires an ALJ to determine whether a claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings."  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826.  If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings and meet the duration requirement (20 C.F.R. §§ 404.1509, 416.909), then an ALJ makes a finding of disability.  20 C.F.R. §§ 404.1520(h), 416.920(h).  If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

At step three in the Decision, the ALJ found that Winsor did not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 29.  He rejected the argument advanced by claimant's representative that she met Listing 1.02A as inconsistent with the objective medical evidence as discussed in his finding at Step Four, concluding the medical evidence did not document Listing-level severity.  *Id.*  Additionally, no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment individually or in combination.  *Id.*

### D.      Step Four – Winsor's RFC

The fourth step of the disability evaluation requires an ALJ to determine whether a claimant has the residual functional capacity ("RFC") to perform her past relevant work ("PRW").  20 C.F.R. §§ 404.1520(f), 416.920(f).  To answer this question, an ALJ must first determine a claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  RFC is a function-by-function assessment of a claimant's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments.  SSR 96-8p.  In making this finding, an ALJ must consider all the relevant evidence such as symptoms and the extent to which they can be reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529, 416.929; SSRs 96-4p, 96-7p.  To the extent that a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the credibility of a claimant's statements based on a consideration of the entire case record.  An ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, and 06-3p.

At Step Four, the ALJ found that Winsor had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a).  AR 29.

In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and the other evidence."  *Id.*  He also considered opinion evidence.  *Id.*  Although the ALJ found that Winsor's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he determined that Winsor's statements concerning the intensity, persistence and

1   limiting effects of those symptoms were not credible to the extent they were inconsistent with his

2   RFC Assessment.  AR 29.

3          With respect to Winsor's alleged symptoms and functional limitations that preclude her

4   from working, the ALJ found that Winsor's statements were not supported by objective medical

5   evidence, and not credible.  AR 30.  He found that Winsor's statements concerning the intensity,

6   persistence, and limiting effects of her symptoms were not credible for a number of reasons.

7   First, he found Winsor's credibility diminished because her allegations were greater than

8   expected in light of the objective evidence in the record documenting periodic treatment from

9   November 2008, through January 2012.  *Id.*  During this period, the medical file documented

10  routine conservative treatment consisting primarily of diagnostic testing, medication monitoring,

11  and follow-up care.  To support these findings, he discussed what he considered the most

12  pertinent medical treatment documented in the records.  In April 2010, Winsor sought treatment

13  for multiple musculoskeletal complaints, primarily knee pain.  *Id.*  Radiographs taken of the knee

14  revealed that her left knee was doing reasonably well, but her right knee revealed significant

15  patellofemoral arthritis.  *Id.*  The only recommended treatment was an exercise program.  *Id.*  In

16  June 2010, Winsor sought emergency treatment for left groin pain.  An ultrasound of the

17  extremities revealed no evidence of deep vein thrombosis.  Winsor was given medication and

18  released in stable condition.  *Id.*  In November 2010, she also sought emergency treatment for

19  fatigue and diarrhea.  *Id.*  X-rays of the chest and abdomen were unremarkable, and she was

20  discharged with instructions to drink liquids and avoid alcohol and greasy foods.  *Id.*

21          In addition to Winsor's treatment records, the ALJ considered the opinions of two

22  consultative examiners and a state agency review physician.  Consultative Examiner Dr. David

23  Mumford conducted a comprehensive internal medicine evaluation on March 29, 2011.  AR 30-

24  31.   Dr. Mumford diagnosed Winsor with chronic low back pain, a history of asthma,

25  degenerative joint disease of the bilateral knees with preserved range of motion and systemic

26  lupus erythematosus.  *Id.* at 31.  Based on his examination and an x-ray of the bilateral knees, Dr.

27  Mumford assessed Winsor with the capability of lifting up to 20 lbs. occasionally, standing

28  and/or walking for 2 hours a day, and sitting for more than 2 hours a day.  *Id.*  A year later, on

March 22, 2012, Richard A. Cestkowski, D.O. conducted a second consultative examination. *Id.* Dr. Cestkowski's examination included x-rays of Winsor's bilateral knees, which revealed only mild osteoarthritic changes. *Id.* Dr. Cestkowski opined Winsor was capable of lifting up to ten pounds occasionally, standing and walking a combined total of four hours a day, and sitting for four hours a day. *Id.* The ALJ found that these medical records cast doubt on Winsor's credibility because although she alleged severe and disabling knee pain, the objective medical evidence simply did not support her claim. *Id.*

The ALJ also found Winsor's credibility was diminished because she had not sought the type of treatment one would expect of a totally disabled individual. *Id.* The limited treatment records indicated treatment she received was limited to diagnostic testing, medication monitoring, and dietary management which suggested she was likely exaggerating the severity of her symptoms and limitations. *Id.*

The ALJ further found that Winsor's credibility was diminished because, despite her impairments, she "has engaged in a somewhat normal level of daily activity and interactions that include full-time enrollment in online courses, caring for her pet dog, and talking to friends." *Id.* The ALJ also found that Winsor's continued attempt to find employment and receipt of unemployment benefits were "fundamentally inconsistent with a claim for disability" because, to receive unemployment benefits, one must be able to work, be available for work, and be willing to seek and accept suitable work. *Id.* He based his findings on Winsor's testimony at the hearing that she had received unemployment benefits for at least part of the period following her alleged onset date. *Id.*

The ALJ also considered the findings of the state agency review physician, Dr. Julius Villaflor, who assessed Winsor was capable of sitting for 6 hours a day due to good lumbar and extremity joint range of motion and no evidence of neurological deficits. *Id.* He cited Social Security Ruling 96-6p which relates that state agencies consultants are highly qualified physicians who are experts in the social security disability program and in evaluation of medical issues in disability claims. *Id.* He found Dr. Villaflor's opinions particularly reasonable in light of the relatively limited treatment records. AR 32. However, he did not fully adopt Dr.

1   Villaflor's assessment that Winsor was capable of lifting up to 20 pounds occasionally.  *Id.*  To
2   give Winsor the benefit of the doubt, and to take into account her obesity, the ALJ reduced
3   Winsor's RFC to a full range of sedentary work.  *Id.*

4       The ALJ considered, but gave only limited weight to, the opinions of consultative
5   examiners Drs. Mumford and Cestkowski.  He noted that consultative examiner's assessments
6   may offer valid snapshots of a claimant's ability on a particular day, but are not necessarily
7   accurate reflections of the claimant's overall physical health.  *Id.*  By contrast, the state agency
8   medical consultant's access to and review of Winsor's entire medical record offered a more
9   comprehensive assessment of her general health, and was therefore accorded greater weight.  *Id.*
10  The ALJ also noted that Winsor's representative objected to Dr. Cestkowski's report as
11  inconsistent with the weight of the medical evidence.  *Id.*

12      The ALJ considered, but gave little weight to, the opinions of Dr. Theuvenet, Winsor's
13  neurologist.  *Id.*  He reviewed a letter and completed fibromyalgia questionnaire both dated
14  January 5, 2012, in which Dr. Theuvenet stated Winsor was "permanently disabled and unable to
15  perform work of any type."  *Id.*  The ALJ pointed out that determining disability is an issue
16  reserved for the Commissioner.  *Id.*  Additionally, there was nothing in the record to indicate that
17  Dr. Theuvenet was familiar with the definition of disability under the Social Security Act and
18  regulations, and her conclusory statement that Winsor was "disabled" did not list the objective
19  medical facts upon which the opinion was based.  *Id.*  Finally, he found Dr. Theuvenet's opinion
20  inconsistent with the medical records which detailed relatively unremarkable symptoms and a
21  routine treatment regimen.  *Id.*

22      Although Winsor did not claim obesity as a disabling condition, the ALJ found that
23  Winsor's obesity was a severe impairment.  *Id.*  Medical records documented her weight at 241
24  pounds with a height of 5'6", with a body mass index ("BMI") of 39.9.  Citing SSR 02-1p, he
25  noted a BMI equal to 40 is considered "extreme" obesity and represents the greatest risk of
26  developing obesity-related impairments.  *Id.*  He therefore considered her weight and its impact
27  on her ability to ambulate, as well as her other body systems, within the "functional limitations"
28  of his decision, and found it was an additional basis to limit her to sedentary work.  AR 33.

In short, he found the evidence as a whole supported a RFC assessment of a full range of sedentary work. *Id.* He found Winsor less than credible based on the objective medical evidence which did not support the alleged severity of her symptoms. *Id.* Accordingly, he found that Winsor's medical impairments did not deprive her of the ability to perform work for any 12-month period since the alleged onset date. *Id.*

### E.      Step Four – Winsor's Ability to Perform her PRW

Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an ALJ utilizes the RFC assessment to determine whether a claimant can perform her past relevant work ("PRW"). 20 C.F.R. §§ 404.1520(f), 416.920(f). PRW means work performed either as a claimant actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have lasted long enough for a claimant to learn the job and to perform it as SGA. 20 C.F.R. §§ 404.1560(b), 404.1565, 419.960(b), 416.965. If a claimant has the RFC to perform his or her past work, then an ALJ makes a finding that a claimant is not disabled.

At step four in the Decision, the ALJ concluded that Winsor was capable of performing her PRW as a legal secretary and receptionist. *Id.* Neither of these positions requires performance of work-related activities precluded by Winsor's RFC. *Id.* In making his findings he relied upon the testimony of vocational expert, Dr. Robin Generaux, who testified the legal secretary and receptionist positions were both past relevant work performed at a sedentary exertional level. *Id.* Because Winsor was capable of performing the full range of sedentary work, both as generally performed in the national economy and as actually performed by Winsor, the ALJ concluded she was able to return to this past relevant work[2]. As a result, the ALJ found Winsor had not be under a disability, as defined by the Social Security Act from April 18, 2007, through the date of the decision, and he therefore denied her claim for disability and disability

---

[2] The Dictionary of Occupational Titles (DOT) describes Winsor's PRW as a legal secretary as SVP 6 and sedentary. Her work as a receptionist is defined by DOT as SVP 4 and sedentary. AR 62.

insurance and supplemental security income benefits.  As he found Windsor was not disabled and could perform her PRW, Step Five analysis was not required.

### III.   THE PARTIES' POSITIONS

#### A.  Winsor's Motion to Reverse and/or Remand (ECF No. 18)

Winsor seeks a Remand to the Commissioner solely for calculation and awarding of benefits.  In the alternative, she requests the case be remanded for a new hearing and decision consistent with her arguments the ALJ committed reversible error.  Winsor claims the ALJ committed legal error in rejecting three mutually supportive medical source opinions that supported her claim of disability.  Specifically, Winsor argues the ALJ erred in granting little or no weight to the physical function assessments of Drs. Mumford, Cestkowski, and Theuvenet.  She also claims the ALJ erred in the weight he gave the opinion of non-examining review physician Dr. Villaflor, which "stands in stark contrast to those of each of the examining and treating sources" and was not supported by independent evidence.  Winsor also claims the ALJ erred by failing to adequately consider the side effects of prescribed medications.

Finally, Winsor argues the ALJ committed legal error in finding Winsor's subjective complaints were not credible.  The Ninth Circuit applies a "clear and convincing" standard supporting an ALJ's rejection of a Winsor's subjective complaints.  The five rationales cited by the ALJ in his decision for disbelieving Winsor do not meet the clear and convincing standard.  Because her treating doctor and both state agency examining doctors endorsed limitations supportive of Winsor's disability claim, the ALJ's stated reasons for disbelieving her are either factually inaccurate or legally unavailing.  The ALJ's adverse credibility determination should not stand, and the court should therefore reverse and remand solely for calculation and award of benefits.  Alternatively, the case should be remanded to the Commissioner for a new hearing and decision applying the proper legal principles.

#### B.  The Commissioner's Opposition and Cross-Motion to Affirm (ECF Nos. 21, 22)

The Commissioner argues the ALJ gave appropriate weight to Dr. Villaflor's opinion because it was most consistent with Winsor's mild objective findings and history of routine and conservative treatment.  The Commissioner also argues that the ALJ properly considered

1    Winsor's subjective symptom testimony including alleged medication side effects.   Her

2    testimony was the only evidence supporting her subjective symptom testimony, and Winsor

3    offered no objective evidence that her medication affected her concentration.  The Commissioner

4    also argues that the ALJ properly discredited Winsor's subjective symptom testimony as not

5    fully credible to the extent it was inconsistent with his residual functional capacity analysis

6    because Winsor's activities of attending graduate school for a doctorate degree, caring for and

7    walking her dog, and socializing with friends suggests a much higher functioning than she

8    alleged.  Additionally, the  Commissioner points out that the ALJ also found Winsor's continued

9    attempts to find employment, and receipt of unemployment benefits in 2010 were inconsistent

10   with her claim for disability as she was required to affirm to the state that she was capable of

11   working and looking for jobs to receive benefits.

12          **C.  Winsor's Reply and Opposition (ECF Nos. 23, 24)**

13          Winsor replies that the Commissioner's arguments in support of her opposition offer

14   entirely new rationales for the rejection of medical source opinions that the ALJ did not raise in

15   his written opinion.  Longstanding Ninth Circuit authority requires that the court review an

16   ALJ's decision based on the reasoning and factual findings offered by the ALJ, "not *post hoc*

17   rationalizations that attempt to intuit what the adjudicator may have been thinking."  (Citing

18   *Bray v. Astrue*, 554 F.3d 1219, 1225 (9th Cir. 2009)).  The reply also reiterates arguments that

19   the ALJ improperly discredited Winsor's credibility and failed to evaluate the side effects of her

20   prescribed medications.

21   **IV.   THE ADMINISTRATIVE RECORD**

22         The Administrative Record contains: UMC emergency department records for a June 3,

23   2010 visit for a complaint of groin pain; progress notes and lab reports for the period of May 15,

24   2009, to July 21, 2010, from Dr. Maria Adolfo; emergency department records for fatigue and

25   diarrhea from Sunrise Hospital on November 7, 2010; UMC Peccole Quick Care clinic and lab

26   notes dated September 14, 2010, to November 10, 2010; and medical evidence submitted by Dr.

27   Nicole Theuvenet dated November 7, 2011, to January 5, 2012.  The only other medical opinion

28   evidence consisted of the medical consultant's review conducted by Dr. Jonathan Nordlicht on

November 4, 2010, Dr. David Mumford's internal medicine consultative examination on March 29, 2011, Dr. Cestkowski's evaluation on March 22, 2012, and the physical RFC assessment conducted by Dr. Julius Villaflor dated April 13, 2011.

### A.   Treating Providers' Records

#### 1.   UMC Records

The earliest medical treating records in the Administrative Record consist of UMC clinic notes dated November 4, 2008, through July 20, 2009.  These records consist of patient progress notes for Winsor's visits to the Coumadin Clinic to monitor her Coumadin levels.  AR 225-235.

Winsor was seen at the UMC emergency room on June 3, 2010, for left groin pain.  She reported that she had experienced sharp inguinal pain in her left groin area for the past two weeks which was worse with movement and flexion of the hip.  AR 240-241.  At the time of this visit, she had been in physical therapy, doing a lot of low impact, low resistance workouts in the swimming pool and in the gym.  AR 241.  Her medications at the time included Coumadin, Ambien, Lortab, Clonazepam, Ventolin, and Meloxicam.  *Id.*  She was described as mildly obese.  *Id.*  On physical examination, slight increased pain in the left groin region was noted.  *Id.*  Her pulses were palpable throughout this area.  *Id.*  There was no evidence of cellulotitis or eurethama or swelling.  *Id.*  Winsor had good range of motion in all four extremities, but did have "decreased secondary to pain in the left hip through flexion-extension."  *Id.*  She was treated and released with a clinical impression of muscle strain and groin pain.  AR 242.  Under the medical decision making section of the form, a note was made that she was therapeutic on her INR with no evidence of DVT.  *Id.*  Winsor reported that she intended to continue with her exercise, and was instructed to take her medications as previous prescribed, ice the area, and return back if her symptoms worsened.  *Id.*  She was stable and improved on discharge.  *Id.*

#### 2.   Dr. Adolfo

The progress notes for Winsor's treatment with Dr. Adolfo are dated between May 15, 2009, and July 21, 2010.  AR 251-279.  The records contain a "problem list" listing Winsor's reported problems on May 15, 2009, as "Factor V Def; recurrent DVT; bronchial asthma; restless leg syndrome; and fibromyalgia."  AR 251.  The records contain a page-and-a-half "medication

list" for various medications including Warfarin, Hydrocodone, Clonazepam, Ambien, and Tramadol.  AR 252-253.  A number of medications have a line stricken through them, apparently indicating that those prescriptions were no longer prescribed or refilled.  These prescriptions included Mirapex and Meloxicam.  The records primarily reflect medication monitoring.

A history and physical exam was conducted by Dr. Adolfo on May 15, 2009, when Winsor reported for a medication refill and to get established.  AR 273-277.  Winsor reported she had Factor V deficiency and a history of recurrent DVTs for which she went to UMC for Coumadin Clinic for liver INR.  *Id.*  Winsor also reported mild seasonal asthma and restless leg syndrome, but doing well on Klonopin at bedtime.  *Id.*  Dr. Adolfo's note indicated "she has questionable DX of SLE.  I suspect she has a (+) ANA test.  She does not have any SX [symptoms] at present."  AR 273.  Dr. Adolfo reported her medications as Coumadin and Meloxicam.  Her neurologic findings were unremarkable, although Dr. Adolfo noted she was obese.  AR 276.  The assessment and plan following this visit was to prescribe Clonazepam for RLS, continue Coumadin for recurrent Factor V deficiency and DVT, and continue Meloxicam for fibromyalgia, and Hydrocodone as needed.  AR 277.  Finally, the doctor's report indicated she would request records from a previous primary care provider.  AR 277.  There are no records for the prior primary care provider within Dr. Adolfo's records in the Administrative Record.

Dr. Adolfo also saw Winsor on July 21, 2009, for medication refill indicating she needed a slip to monitor her PT and INR once a month.  AR 270.  At the time of her visit, Winsor had been followed up with the UMC Coumadin Clinic, but now wanted Dr. Adolfo to monitor her PT and INR.  *Id.*  Winsor reported she had a history of recurrent DVT due to Factor V deficiency, and also had fibromyalgia.  *Id.*  Dr. Adolfo continued her on a dose of Coumadin ordering repeat PT and INR in a month, and continued her on Meloxicam and Hydrocodone.  AR 272.

A progress note dated February 5, 2010, indicated that Windsor came in for follow up for recurrent DVT, RLS [restless leg syndrome], and chronic pain syndrome/fibromyalgia.  At the time of this visit, Winsor claimed she was not tolerating Mirapex and instead uses Clonazepam for RLS.  Her Warfarin was continued, Winsor was warned on the dependence and tolerance of

1    Clonazepam for RLS, prescribed Tramadol, and warned on chronic use of narcotics.  AR 260-

2    262.

3              **3.        Northwest Orthopedics and Sports Medicine**

4              The Administrative Record contains a two-page report of a visit Winsor made with Dr.

5    James Blasingame at Northwest Orthopedics and Sports Medicine on April 12, 2010.  At that

6    time, her chief complaint was knee pain, hip pain, back pain, left heel pain, and left ankle pain.

7    AR 236-237.  The history portion of the report indicates that Dr. Blasingame did an operation on

8    her left knee for patellofemoral maltracking in 1995 consisting of a quadriceps realignment.  AR

9    236.  Winsor had bilateral knee pain.  *Id.*  The election was made to proceed with the left knee

10   initially, and Winsor did not have further care.  *Id.*  Winsor reported she had been very pleased

11   with her results of her knee surgery and fifteen years later she was presenting with bilateral knee

12   pain with the right much greater than the left.  *Id.*  She also reported back pain, right hip pain, left

13   ankle pain, left heel pain, in addition to her knee pain, and that she was on chronic Coumadin

14   therapy for Leiden V Factor disorder.  *Id.*  She also reported a prior right leg deep vein

15   thrombosis.  *Id.*

16             At the time of this visit, she was in graduate school and working as a paralegal.  *Id.*  Her

17   current medications were Ambien, Lortab, Donazapam, Warfarin and Meloxicam.  *Id.*  X-rays

18   were taken of her knees and hip.  AR 237.  Results indicated she had no obvious hip arthritis and

19   her knees showed signs of the prior surgery Dr. Blasingame performed.  *Id.*  X-rays showed only

20   mild femoral tibial arthritic change.  *Id.*  However, on the right side, she had extensive lateral

21   patellofemoral arthritis.  *Id.*  Her left side was congruent with well-maintained joint space.  *Id.*

22   Dr. Blasingame's assessment was that the patient had multiple muscular skeletal complaints, but

23   that primarily the reason for her visit was to follow up on her knee.  *Id.*  Her left knee was "doing

24   reasonably well at 15 years after an extensive alignment."  *Id.*  However, her right knee had

25   "significant patellofemoral arthritis."  *Id.*  The only treatment plan was to address her tight heel

26   cord with stretching, and to address hip pain with an exercise program as well as an exercise bike

27   for her knees and quadriceps, and leg lifts.  *Id.*  He indicated he would be happy to see her on an

28

as-needed basis.  *Id.*  However, there are no other records for treatment with Dr. Blasingame or the clinic.

### 4.    Dr. Arverilla

Winsor was treated by Dr. Divina Arverilla at UMC Peccole Quick Care between September 14, 2010, and November 10, 2010.  AR 305-319.  On September 14, 2010, her chief complaints/reason for her visit was for a medical review and checkup.  She complained of knee pain indicating a recent right knee x-ray was taken on April 12, 2010.  The physician's order section of the form indicated UMC records on her Coumadin needed to be obtained, and Winsor's prescription for Hydrocodone was refilled.  Discharge instructions contain a note "letter for disability."  AR 311-312.  Winsor returned a month later on October 14, 2010.  At the time of this visit, she was ambulatory and requested a disability letter with a complaint of back pain.  A pain level 0 on a scale of 1 to 10 was circled.  AR 308.  She denied having a recent fall, or being afraid of falling.  *Id.*  A strength and balance assessment was conducted which she passed.  *Id.*  The doctor ordered lab tests and a return to the clinic in one month.  *Id.*  At the time of this visit, Winsor reported fatigue.  AR 309.  On physical examination, she was in no acute distress and was alert.  *Id.*  Examinations of her ear, nose, throat, neck and respiratory system were normal.  *Id.*  The word "anxious" was circled with a hand-written note "not all time."  *Id.*  Examination of her back and her extremities was normal and non-tender.  AR 310.  On neurological/psychological examination, she was oriented times three.  *Id.*

She returned for a visit on November 10, 2010, for follow up.  She reported a pain level as zero.  AR 305.  She denied being involved in a recent fall, being afraid of falling or having any physical limitations requiring the use of a walker, crutches or cane.  *Id.*  A stress and balance assessment was done which she passed.  *Id.*  The physician's orders section of the record reflected an oxygen saturation rate of 98% and recommended follow up with a rheumatologist.  *Id.*  The diagnosis was lupus, chronic pain, elevated liver enzyme and gastroenteritis.  *Id.*  It appears this visit was a follow up to her hospitalization at Sunrise for complaints of diarrhea and vomiting.  AR 306.  On physical examination, she was in no acute distress.  *Id.*  ENT, neck and

respiratory examinations were normal.  *Id.*  Her back and extremities were normal and non-tender.  AR 307.  She was recommended for a follow up in a month.  *Id.*

### 5.      Sunrise Hospital

Winsor went to Sunrise Hospital emergency room on November 7, 2010, complaining of fatigue and diarrhea where she was treated and released after IV fluids were started, and X Rays were taken.  She left reporting a pain of 0 on a scale of 1 to 10 indicating she felt better.  AR 287-289.  She left the emergency department ambulatory via private vehicle with a family member driving.  *Id.*

### 6.      Dr. Nicole Theuvenet

Winsor also saw neurologist Dr. Nicole Theuvenet on January 5, 2012.  The ALJ considered her two-page narrative report (AR 344-345) and a fibromyalgia impairment questionnaire she filled out at the request of Binder & Binder.  AR 346-351.  There are no other treatment records for Dr. Theuvenet in the Administrative Record.  The narrative report indicates that Dr. Theuvenet was "currently following" Winsor in her neurological practice and had initially seen her over five years ago.  AR 344.  However, due to insurance and financial restrictions, Winsor had not been seen in a follow up until 2011.  *Id.*  Dr. Theuvenet indicated that Winsor continued to have "chronic pain in the setting of Lupus, Fibromyalgia, peripheral neuropathy, and restless leg syndrome."  *Id.*  "Her symptoms included pain, weakness and numbness in the arms and legs, neck pain, low back pain, problems with coordination and balance, fatigue, and joint pain most severe in her knees and feet."  *Id.*  On examination she was able to walk short distances independently, but had a wide-based antalgic gait and lost balance easily.  *Id.*  Winsor was able to go out for short errands, but uses motorized scooters provided by the stores whenever possible due to pain and weakness in her legs which limited her ability to walk.  *Id.*  Dr. Theuvenet indicated that Winsor was on daily pain medications, but her symptoms were "still poorly controlled."  *Id.*  The report indicated Winsor had other medical problems including asthma, recurrent deep vein thrombosis with Factor V Leiden deficiency which contributed to her current condition.  AR 345.  The report concludes: "[d]ue to the patient's multiple medical and neurological conditions and associated symptoms, the patient is

permanently disabled and unable to perform work of any type.  Her condition is permanent, progressive, and irreversible." *Id.*

The questionnaire indicates that Dr. Theuvenet first treated Winsor in 2005, and her most recent exam was November 7, 2011. AR 346.  (There is no record for a November 7, 2011 exam in the AR.)  Diagnosed impairments included peripheral neuropathy with neuropathic pain, Lupus, recurrent deep vein thrombosis, restless leg syndrome, arthritis, and asthma.  *Id.*  Her prognosis was fair to poor.  *Id.*  Positive clinical findings were listed as: multiple tender points to palpation, to neck, back, arms, hips and legs, decreased sensation to all modalities in arm and legs in glove-stocking distribution, antalgic, ataxic gait, loss of balance, fatigue, problems with balance and coordination.  AR 346-47.  When asked whether there were any laboratory and diagnostic tests demonstrating or supporting the diagnoses, Dr. Theuvenet wrote "n/a – clinical diagnosis of fibromyalgia, peripheral neuropathy and restless leg syndrome."  AR 347.  She described the frequency of Winsor's pain as daily and continuous, and 7 to 10 on a scale of 1 to 10, with the notation "depends on day".  AR 348.  Medications include Klonopin twice a day, Lortab 10 mg one to two times every six hours as needed, Lyrica 75 mg with a notation the dose adjusted based on pain—side effects and availability of medication.  *Id.*

Dr. Theuvenet indicated Winsor could sit 0 to 1, and stand/walk 0 to 1 hours in an 8-hour day with the notation "has to continuously change positions."  AR 349.  She checked the box "yes" in answer to the question whether it would be necessary or medically recommended for Winsor not to sit continuously in a work setting, and indicated Winsor would have to get up and move around every 15 to 30 minutes.  *Id.*  She also checked the box "yes" in response to the question whether it would be necessary or medically recommended for Winsor not to stand/walk continuously in a work setting with the notation "at high risk for falls."  Winsor could lift and carry 0 to 10 pounds occasionally, 10 to 20 pounds rarely, and never more than 20 pounds.  *Id.*  The doctor checked the box she was incapable of even low stress jobs.  *Id.*  The doctor also noted that stress can aggravate a patient's symptoms and increase potential for flare-ups/exacerbations.  AR 350.  Dr. Theuvenet indicated her patient was unable to work, her symptoms were likely to produce "good days" and "bad days" and she would need to be absent from work more than

three times a month.  *Id.*  Under additional comments, she wrote: "[t]he patient is permanently disabled and unable to perform work of any type."  AR 351.

### B.   Consultative Exams

Two consultative exams are part of the Administrative Record.  One performed by Dr. David Mumford on March 29, 2011, and a second by Dr. Richard Cestkowski conducted a year later on March 29, 2012, at the request of the ALJ after the hearing.  AR 358-368.  Also, at the ALJ's request, additional x-rays of the Plaintiff's knees were taken, the results of which Dr. Cestkowski considered.  AR 369-370.

### 1.   Dr. Mumford

Winsor's chief complaint when she visited with Dr. Mumford was low back pain, asthma, problems with both knees, and Systemic Lupus Erythematosus (SLE).  Under the history of present illness section, he indicated that she had pain in her lower back without radiation and had received physical therapy for it.  AR 320.  The pain was made worse by walking, standing, and sleeping, and improved by sitting for short periods of time and taking medication.  *Id.*  She stated she used a cane.  *Id.*  She had not been hospitalized and did not use oxygen for asthma, but did use inhalers.  *Id.*  She had pain in both knees with difficulty walking with a history of left knee surgery in 1995, and had been told she needs total knee replacement of both knees.  *Id.*  She was diagnosed with systemic lupus erythematosus (SLE) in 1985, but it affected mostly the skin of her face and caused fatigue with no joint involvement.  *Id.*  Medications taken at the time of the visit were Lyrica, Lortab, and Clonazepam.  AR 321.

Dr. Mumford described Winsor as a person who was credible with excellent cooperation and friendly throughout the examination.  At 240 pounds and 5'6" tall, he described her as "markedly obese".  *Id.*  She entered the room using a cane in her right hand which she stated she used for stability.  *Id.*  She was able to bend completely at the waist, sit comfortably without shifting in the chair, stand from a sitting position, and sit from a supine position without difficulty.  AR 321-322.  She was able to get on and off the exam table independently without difficulty.  AR 322.  Range of motion for her neck were within normal limits with no evidence of pain with movement or paravertebral muscle spasm.  *Id.*  Respiratory auscultation revealed

normal excursions without appreciable wheezing bronchi or rubs. *Id.* Examination of the hips was normal. *Id.* Examination of the left knee showed moderate subcutaneous hypertrophy and an extensive well-healed scar with full range of motion. AR 323. The right knee showed moderate subcutaneous hypertrophy consistent with degenerative joint disease with full range of motion. *Id.* There was no evidence of deformity or swelling of any joint, and range of motion for the upper and lower extremities was within normal limits. *Id.* Winsor had normal range of motion of her back with normal straight-leg raising and supine-leg raising. *Id.* Squatting was not attempted. *Id.* She was able to sit up from a lying position and reach her ankles. *Id.* Her gait and station showed "bilaterally genu varum[3]." *Id.* Her gait was markedly abnormal which he described as a limping gait with the aid of a cane. *Id.* She was not able to perform tandem walking because of unstable knees. *Id.* However, toe walk and heel walk was normal. *Id.*

Dr. Mumford's diagnoses were: (1) subjective complaints of low back pain, but on physical examination, no significant mechanical problem with lumbar spine; (2) history of asthma with no evidence of cough, audible wheezing or dyspnea, and chest is clear; (3) degenerative joint disease of both knees with preserved range of motion with 1995 surgery on left knee; and (4) diagnosis of systemic Lupus erythematosus which affects only her skin. AR 324. His functional assessment was that Winsor could frequently lift 10 pounds, occasionally lift 20 pounds, and was able to stand and/or walk two hours in an 8-hour work day. *Id.* Winsor was limited because of her knee problems and needed an assistive device for short distance ambulation on level surfaces. *Id.* His assessment was she could sit for 2 hours or more in an 8-hour work day and was limited because of her knee problems. *Id.* However, he answered "yes" to the question whether she needed to alternate sitting and standing, and whether standard breaks and lunch period would provide sufficient relief. *Id.* He also answered "yes" to the question whether standard breaks and lunch periods would provide sufficient relief to allow work for 8 hours. AR 325. She had no limitations in reaching, fingering, handling objects, hearing, seeing,

---

[3] Genu varus or genu varum is the plural of genua vara. It is the Latin adjective describing any joint in an extremity that is deformed in such a way that the more distal of the two bones forming the joint deviates from the midline, as in bowlegged, *i.e.*, bent inward or knock-kneed. Stedman's Medical Dictionary.

speaking, traveling, with heights, moving machinery, temperature extremes, vibration, or noise. *Id.* However, because of her history of asthma, she should be restricted from exposure to chemicals and dust. Also, she should not be exposed to sunlight because of her Lupus. AR 325-326.

### 2. Dr. Cestkowski

Dr. Cestkowski examined and evaluated Winsor after the administrative hearing at the request of the ALJ on March 22, 2012, and submitted a report March 29, 2012. AR 358-374. He was authorized to x-ray the right and left knee and reviewed medical records beginning with a note from Northwest Orthopedics and Sport Medicine dated April 12, 2010. AR 358. He also reviewed Dr. Mumford's March 29, 2011 report and evaluation and a note from neurologist Dr. Theuvenet dated January 5, 2012. *Id.* Dr. Cestkowski's report noted Plaintiff's height as 5'6", and weight of 241 pounds. AR 359. He described Winsor as cooperative with no evidence to suggest symptom magnification. *Id.* She appeared to be in mild to moderate discomfort throughout the evaluation process secondary to her multiple symptom areas. *Id.* On orthopedic examination she complained of pain and palpation to her paracervical and trapezius musculature. *Id.* However, she had full range of motion. *Id.* No spasm or guarding was present. *Id.* No cervical spine process tenderness was present and Spurlings sign was negative. *Id.* There was no pain, spasm, or guarding on evaluation of the thoracic area. AR 360. She complained of pain on palpation of the lower lumbar paraspinal muscles. *Id.* Mild spasm with guarding to deep palpation was noted. *Id.* She also complained of pain on palpation of both sacroiliac joints. *Id.* Active lumbar range of motion exacerbated her low back pain. *Id.* She complained of pain on palpation of both hips. *Id.* There was tenderness over the right knee with mild retropatellar crepitation noted. *Id.* No varus or valgus deformity was present[4]. *Id.* Winsor complained of pain on palpation of the left ankle, but the remainder of her lower extremity orthopedic examination was unremarkable. *Id.* Orthopedic assessment of the upper extremities was

---

[4] The Latin adjective describing any joint in an extremity that is deformed such that the more distal of the two bones forming the joint deviates away from the midline as in knock-knee, *i.e.*, turned outward or bowlegged. Stedman's Medical Dictionary.

1   unremarkable, she could make a fist with both hands and had good digital dexterity in both

2   hands.  *Id.*

3       On neurological examination of the upper and lower extremities, Dr. Cestkowski found

4   bilateral upper extremity motor examination strength was 5/5, and sensory examination was

5   intact to light touch.  *Id.*  There was no evidence of right or left upper extremity chronic regional

6   pain syndrome.  *Id.*  She had symmetrical patella and Achilles reflexes, and bilateral lower

7   extremity strength of 5/5.  *Id.*  Bilateral lower extremity sensory examination was intact to light

8   touch, and she was negative for nerve tension signs with no evidence of right or left lower

9   extremity chronic regional pain syndrome.  *Id.*

10      With respect to her gait and station, she ambulated to the examining room with the use of

11  a single-point cane, had moderate difficulty arising from the examining table to the floor, and

12  ambulated without use of the cane with a slow, hesitant gait favoring her right side.  AR 361.

13  She was not able to heel-to-toe walk or able to kneel or squat.  *Id.*

14      The x-rays of her right and left knee were performed in the office and reviewed by Lake

15  Mead Radiology for formal interpretation.  *Id.*  The impression of the left knee was old trauma

16  and osteoarthritic changes.   AR 361, 369.   The impression of the right knee was mild

17  osteoarthritic changes, with tri-compartmental narrowing and marginal osteophyte formation.

18  AR 361, 370.

19      Dr. Cestkowski's clinical assessment was: (1) bilateral knee pain, status post left knee

20  surgery with evidence of arthritis-type changes on x-ray to both knees; (2) complaints of lower

21  back pain with no objective evidence of lower extremity radiculopathy; (3) bilateral

22  hip/sacroiliac joint pain; (4) cervical/trapezius pain; (5) left ankle pain; (6) complaints of right

23  and left knee instability with no objective evidence of meniscal or ligamentous pathology; (7)

24  SLE; (8) restless leg syndrome; (9) asthma; (10) Factor IV [sic] Leiden deficiency with right and

25  left lower extremity deep vein thrombosis; (11) fibromyalgia; (12) peripheral neuropathy; (13)

26  status post-gastric bypass; and (14) status post tonsillectomy and adenoidectomy.  *Id.*  He

27  concluded the report by indicating Winsor was symptomatic in multiple areas and that his work-

28

related activity limitation assessment was based on her history, physical examination, review of the medical records, and clinical experience.  AR 362.

Dr. Cestowski found Winsor could frequently lift 10 pounds, and occasionally lift 20 pounds. AR 363.  She could sit without interruption for one hour at a time, and stand and walk 30 minutes at a time without interruption. *Id* at 364.   She could sit a total of 4 hours in an 8 hour day, and stand and walk 2 hours in an 8 hour day. *Id*. She needed a cane and could ambulate without it less than one block. *Id.* She should never climb stairs, ramps, ladders or scaffolds. *Id at* 366. She should never kneel, crouch or crawl. *Id.* She should never be exposed to unprotected heights*,* humidity/wetness, dust, odors or fumes, extreme cold or heat or vibrations. *Id* at 367. She could shop, ambulate without 2 crutches or a wheelchair, use public transportation, climb a few steps with a handrail, prepare simple meals/feed herself, attend to personal hygiene and sort, handle or use paper files*. Id* at 368.  He found the Winsor's noted limitations had lasted or could be expected to last for 12 consecutive months. *Id.*

### C.  Medical Consultant

Dr. Villaflor is a reviewing consultative examiner who made a physical residual functional assessment on April 13, 2011.  AR 335-342, 352-355.  He found that Winsor could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least two hours in an 8-hour workday, and that a medically-required handheld assistive device was necessary for ambulation  more than 50 feet.  AR 336.  He also found she could sit about 6 hours in an 8-hour workday, had some postural limitations, and was limited to short ramps and 2 to 3 step stairs with railings to hold onto.  AR 337.  He found no manipulative limitations, visual limitations, or communication limitations.  AR 338-339.  He found no environmental limitations with respect to wetness, humidity, noise, vibration, fumes, odors, and gases, but should avoid concentrated exposure to extreme heat and cold.  AR 339.  She should avoid all hazardous machinery and height exposures.  *Id.*

He considered medical source statements regarding Winsor's physical capabilities, but his own findings were significantly different from medical source conclusions.  AR 341.  Dr. Villaflor stated the reasons he disagreed with Dr. Mumford's findings in a narrative form.  AR

342.  He noted Dr. Mumford's findings of good grip strength, no limitation of reaching, handling and fingering, full lumbar range of motion and other normal findings in Dr. Mumford's report. *Id.*  Although Dr. Mumford noted a cane was used, heel and toe walk was described as normal. He disagreed with Dr. Mumford's findings that walking and sitting were limited to 2 hours.  *Id.* Stating "it is of note that the claimant has good lumbar and extremity joint ROM . . . there is also no neurological deficit noted . . .  this claimant, with normal breaks, should be able to sit 6 hours in a day . . . considering all of the data now in file, this report is constructed and submitted."  *Id.* His diagnosis was genu varus deformity with knee degenerative changes status post-surgery left knee, obesity, status post gastric bypass/colectomy with a history of Lupus/Factor V abnormalities.  *Id.*  He also reviewed a residual functional capacity evaluation done in September 2010, six months prior to Dr. Mumford's exam and her RFC from September 2010, to current, concluding "there is insufficient data in file to form the basis of a specif RFC or preclude the ability to do light work for a period of twelve months from AOD to 9/10." *Id.*

V.    ANALYSIS AND FINDINGS

Reviewing the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the Court finds the ALJ's decision is not supported by substantial evidence, and the ALJ committed reversible error by giving nearly controlling weight to the opinion of non-examining reviewing consultant Dr. Villaflor.  The ALJ gave little, if any, weight to the opinion of Winsor's treating neurologist, Dr. Theuvenet. The ALJ also considered, but gave only limited weight to the opinions of examining physicians, Drs. Mumford and Cestkowski.

In fairness to the ALJ, Winsor has changed positions on her theory of disability.  At the administrative hearing, her representative claimed she was disabled because she met the criteria of Listing 1.02A based on a major dysfunction of the lower extremity, both knees, because she was unable to ambulate effectively.  She does not make this claim on appeal.  Additionally, as the ALJ correctly noted, the Administrative Record is remarkable for the dearth of treating medical records.

An ALJ is not bound by the medical opinion of a treating physician on the ultimate question of disability.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)); *Stewart v. Colvin*, 575 F. App'x 775, 777 (9th Cir. 2014).  However, if the ALJ rejects the opinion of the treating physician in favor of the conflicting opinion of an examining physician, the ALJ must make "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citation and internal quotation marks omitted).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citation and internal quotation marks omitted).

### A.    Weight Assigned to Medical Opinions Based on Physician Type

The implementing regulations for Title II of the Social Security Act distinguish among the opinions of three types of physicians: (1) treating physicians (*i.e.*, physicians who actually treat a claimant); (2) examining physicians (*i.e.*, physicians who examine but do not treat a claimant); and (3) non-examining or reviewing physicians (*i.e.*, physicians who neither examine nor treat the claimant, but review the claimant's file).  *Lester v. Chater*, 81 F.3d, 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than an examining physician's, and an examining physician's opinion is entitled to more weight than a reviewing physician's.  *Lester*, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).

The ALJ must consider all medical evidence.  *See* 20 C.F.R. § 404.1527(b).  However, the Social Security Regulations give more weight to opinions that are explained than those that are not.  20 C.F.R. § 404 .1527(d)(3). The Social Security Regulations also give more weight to opinions of specialists concerning matters relating to their specialty over that of non-specialists.  20 C.F.R. § 404.1527(d)(5).  Factors that an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and]

the specialty of the physician providing the opinion." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

### 1.  <u>Treating Physician Opinions</u>

A treating physician's opinion is afforded great weight because such physicians are "employed to cure and [have] a greater opportunity to observe and know the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830. Moreover, the Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results.  *Id.* at 832–33.

The Social Security rules expressly require a treating source's opinion on an issue of a claimant's impairment be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2).  If a treating source's opinion is not given controlling weight, the weight that it will be given is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence supporting the opinion, consistency with the record as a whole, the source's specialization, and other factors.  *Id.*

Finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion should be rejected:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527.... In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Orn*, 495 F.3d at 631–32 (quoting SSR 96–2p, 61 Fed. Reg. 34489 (July 2, 1996).  Where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ

27

1   may not reject the opinion of the treating physician without setting forth specific, legitimate

2   reasons supported by substantial evidence in the record.  *Id.* at 632.

3                   **2.**      **Examining Physician Opinions**

4           Further, an examining physician's opinion generally must be given greater weight than

5   that of a non-examining physician. *Lester*, 81 F.3d at 830.  As with a treating physician, there

6   must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining

7   physician, and specific and legitimate reasons, supported by substantial evidence in the record,

8   for rejecting an examining physician's contradicted opinion.  *Id.* at 830–31.  *See also Reddick v.*

9   *Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (an ALJ must provide specific and legitimate reasons,

10  supported by substantial evidence in the record, to reject an examining physician's opinion).

11                  **3.**      **NON-Examining Physician Opinions**

12          The opinion of a non-examining physician is not itself substantial evidence that justifies

13  the rejection of the opinion of either a treating physician or an examining physician.  *Lester*, 81

14  F.3d at 831. "The opinions of non-treating or non-examining physicians may also serve as

15  substantial evidence when the opinions are consistent with independent clinical findings or other

16  evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

17          The ALJ rejected Dr. Theuvenet's opinions that Winsor's fibromyalgia and other

18  diagnosed conditions were disabling.  He found that the objective record did not rule out other

19  diagnosed severe impairments as responsible for the symptomatology with which Winsor

20  presented.  AR 29.  He also found there was no medical and other evidence that fibromyalgia

21  alone causes more than minimal effect on her ability to work.  *Id.*  He therefore found Winsor's

22  fibromyalgia was non-severe.  Winsor acknowledges that the determination of whether she is

23  disabled for purposes of the Social Security Act is a legal determination reserved for the

24  Commissioner. However, she argues the ALJ did not provide specific and legitimate rationales

25  for rejecting Dr. Theuvenet's assessment and findings concerning her patient's functional

26  limitations.  The court agrees.

27          The ALJ found that Winsor was capable of performing a full range of sedentary work,

28  and therefore, capable of performing her past relevant work as a receptionist and legal secretary.

Both positions are classified as sedentary work under the applicable DOT definitions. Dr. Villaflor's opinion supported the ALJ's finding Winsor was capable of performing her past relevant work as a receptionist and legal secretary as he found Winsor was able to do light work and able to sit for six hours a day. The opinions of Winsor's treating physician, Dr. Theuvenet and state examining physicians, Drs. Mumford and Cestowski, did not support the ALJ's finding Winsor was capable of performing a full range of sedentary work.

Sedentary work requires the ability to sit for long periods of time because it is performed mostly in a seated position. *See* Social Security Disability Law & Procedure in Federal Court § 3:52 (2016). Thus, sitting is one of the exertional demands of sedentary work. *Id*. To be able to do sedentary work, a claimant must be able to sit for at least six hours out of an eight-hour work day. *See* SSR 83-10, 45 Fed. Reg. 55566 (Aug. 20, 1980) (modified for ease of understanding, originally published at 43 Fed. Reg. 55349 (Nov. 28, 1978)). A claimant who cannot sit for six hours in an eight-hour day cannot perform the full range of sedentary work. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). A claimant who can sit or stand for only a short time, and must lie down often, cannot perform sedentary work. *See, e.g.*, *Horton v. Astrue*, 252 Fed. Appx. 160, 161 (9th Cir. 2007). The need to lie down negates the ability to perform sedentary work.

Pursuant to 20 C.F.R. § 404.1567, "sedentary work" involves:

> lifting no more than 10 pounds at a time, and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001).

The Social Security Rulings provide that an individual who must alternate between sitting and standing "is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work … or the prolonged standing or walking contemplated for most light work." *See* SSR 83-12, 45 Fed. Reg. 55566 (Aug. 20, 1980) (modified for ease of understanding, originally published at 43 Fed. Reg. 55349 (Nov. 28, 1978)); *Fraga v. Sullivan*, 828 F. Supp. 737 (N.D. Cal. 1993). Under the SSA's rulings and regulations, "to be physically

able to work the *full range* of sedentary jobs, the worker must be able to sit through most or all of an eight hour day." *Aukland v. Massanari*, 257 F.3d 1033, 1036 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1103 (9th Cir. 1999)).

The ALJ gave little weight to the opinion of Dr. Theuvenet that Winsor was permanently disabled and unable to perform any type of work for four reasons. First, he correctly noted that determination of disability is an issue reserved to the Commissioner. Second, although Dr. Theuvenet used the term "disabled" it was not clear that she was familiar with the definition of disability as contained in the Social Security Act and regulations. Third, he found Dr. Theuvenet's "blanket statement" that Winsor was disabled conclusory, and lacking the objective findings upon which she based the opinion. Fourth, he found her opinion that Winsor was disabled inconsistent with the medical records, which detailed relatively unremarkable symptoms, and a routine and conservative treatment regimen consistent with those symptoms. He did not address Dr. Theuvenet's assessment of Winsor's physical limitations.

The ALJ considered, but gave only limited weight to the opinions of Drs. Mumford and Cestkowski finding that their assessments may offer "valid snapshots" of Winsor's abilities on a particular day, but were not "necessarily accurate reflections of the claimant's overall physical health." AR 32. He found Dr. Villaflor's opinion was based on access to and review of Winsor's entire medical record and was therefore "a more comprehensive assessment of the claimant's general health". He therefore he accorded it greater weight. *Id.* However, this finding was clearly erroneous. Dr. Villaflor considered and disagreed with some of Dr. Mumford's findings. Dr. Villaflor also considered a 2010 RFC, presumably the one conducted by Dr. Nordlicht, as it is in the AR at 284-285. Dr. Villaflor's report is dated April 13, 2011. Dr. Villaflor did not have, and could not have considered, the consultative report and residual functional capacity findings made by Dr. Cestkowski in his March 20, 2012 report, or Dr. Theuvenet's January 2012 narrative report and fibromyalgia questionnaire.

The opinion of a non-examining reviewing physician is not itself substantial evidence justifies rejection of treating physician and examining physician opinions. The ALJ accepted Dr. Villaflor's RFC opinions with the exception of giving Winsor the benefit of the doubt that she

1    could not occasionally lift 20 pounds because of her obesity, and therefore found she was

2    capable of a full range of sedentary work.  Dr. Villaflor's RFC opinion was based in part on Dr.

3    Mumford's finding Winsor's heel and toe walk was normal.  A year later, Dr. Cestkowski's

4    examination and evaluation found that Winsor was no longer able to walk heel to toe.  Dr.

5    Villaflor also based his opinion that Winsor should be able to sit for six hours in an eight hour

6    day because Dr. Mumford's report noted she had good lumbar and extremity joint range of

7    motion and no neurological deficit was noted.  However, Dr. Cestkowski's clinical assessment

8    was that Winsor suffered from fibromyalgia and peripheral neuropathy which was consistent

9    with Dr. Theuvenet's opinion.  Dr. Theuvenet's narrative report opines that Winsor's symptoms

10   included pain, weakness and numbness in the arms and legs, neck pain, low back pain, problems

11   with coordination and balance, fatigue, and joint pain most severe in her knees.  Diagnosed

12   impairments included peripheral neuropathy with neuropathic pain.

13        It is clear that between Dr. Mumford's March 2011 examination and evaluation, and Dr.

14   Cestkowski's March 2012 evaluation, that Winsor's condition had deteriorated.  Dr. Villaflor did

15   not have the benefit of either Dr. Cestowski's report, or Dr. Theuvenet's narrative report and

16   fibromyalgia questionnaire.  Under these circumstances, the court finds that the ALJ committed

17   reversible error in giving near controlling weight to Dr. Villaflor's opinions over the opinions of

18   Winsor's treating physician, Dr. Theuvenet, and state agency examining physicians, Drs.

19   Mumford and Cestowski.

20        The ALJ's decision also failed to mention, let alone evaluate, Winsor's testimony about

21   the effects of her medications on her ability to work. See, *Ericson v. Shalala*, 9 F 3d 813, 817-18,

22   (9th Cir. 1993).  Having found that the ALJ committed reversible error by giving controlling

23   weight to Dr. Villaflor's opinion based on an erroneous finding Dr. Villaflor  had access to and

24   had reviewed Winsor's entire medical record, the court need not decide Winsor's other claims of

25   error.

26                          **CONCLUSION**

27        Having reviewed the Administrative Record as a whole, and weighing the evidence that

28   supports and detracts from the Commissioner's conclusion, the court finds that the ALJ

committed reversible error by giving near controlling weight to Dr. Villaflor's opinions.  The ALJ concluded that Dr. Villaflor's opinions were particularly reasonable in light of the relatively limited treatment records.  The ALJ correctly noted the limited treatment records.  However, he erroneously found that Dr. Villaflor's access to and review of Winsor's entire medical record offered a more comprehensive assessment of her general health than the "snapshots" offered on the two specific dates Winsor was evaluated by Drs. Mumford and Cestowski.  He also erred in failing to provide specific legitimate reasons for rejecting Dr. Theuvenet's assessment of Winsor's functional limitations.  Dr. Villaflor clearly did not have Winsor's entire record.  He did not have the more recent examination and treatment records of Drs. Theneunet and Cestowski.

Accordingly,

**IT IS RECOMMENDED:**

1.      Winsor's Motion to Reverse/Remand (ECF No. #18) be **GRANTED IN PART AND DENIED IN PART**.  The Commissioner's final decision in this matter should be remanded for further proceedings consistent with this order.

2.      The Commissioner's Cross-Motion to Affirm (ECF No. #21) is **DENIED**.

Dated this 8th day of September, 2016.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDG